case almost exactly like the present, that depositions which have been thus opened are not admissible. That decision is decisive of the present case, and leaves nothing further to be said. The depositions not being admissible in evidence, there is no ground for a new trial. Motion denied.

## Case No. 12,043.

In re ROSE et al.

WALKER v. BARTON.

[3 N. B. R. 265 (Quarto, 63);[1] 1 Balt. Law Trans. 625.]

District Court, D. Maryland. 1869.

BANKRUPTCY—LANDLORD'S LIEN—WAIVER.

Bankrupts before proceedings in bankruptcy rented storehouse under written lease; assignees retained possession with bankrupts' goods therein, but finally surrendered the premises to the lessor. *Held*, the lessor had a preferred claim for the rent. He had a lien which he could have enforced by distress at the term of commencement of proceedings in bankruptcy, and upon the facts stated had not waived it.

[Cited in Abbott v. Stearns, 139 Mass. 170, 29 N. E. 379.]

By agreement of counsel, the following statement was submitted as setting forth the grounds of the claim of the plaintiff [Noah Walker] against Randolph Barton, assignee in bankruptcy of Rose, Lyon & Co.: Rose, Lyon & Co., on the 5th day of September, 1868, petitioned for the benefit of the bankrupt act [of 1867 (14 Stat. 517)], and Randolph Barton was in the course of proceedings appointed assignee. The bankrupts, before their application in bankruptcy, rented a storehouse from Noah Walker, under a written lease. The following sums, with interest thereon to be calculated, were due as rent on the said lease at the several dates specified:

May 1, 1868, one quarter's rent due.... $525
August 1, 1868, " " " .... 525
November 1, 1868 " " " .... 525
November 23, 1868, rent due to date of surrender ...................... 140

On the 23d day of November, Randolph Barton, assignee, etc.. surrendered the said storehouse to the lessor. The lessor, as each quarter's rent became due, demanded the same, and forbore to distrain, upon the request of the lessees, and with the understanding that the goods of the lessees should be kept upon the premises, so as at all times to be liable to distress. At the time the lessees filed their application in bankruptcy, they were advised that the landlord's claim would be a preferred claim, and that thus their promise would be virtually kept.

GILES, District Judge. On the statement of the question in reference to the claim made by Noah Walker for rent, I am of the opinion that the said claim of the lessor is a preferred claim. For the rent due at the time of the

filing of the petition of Rose, Lyon & Co. to be declared bankrupts, Noah Walker had a lien which he could have enforced by distress, and under the facts stated in the argument there was no waiver of the same. As to that part of the rent which is for the occupation of the store, after the date of the filing of Rose, Lyon & Co.'s petition, that is to be paid as a part of the expenses of the custody, etc., of the bankrupts' estate, and comes within the first-class classification of claims entitled to the priority, by the provisions of the twenty-eighth section of the bankrupt act. I should suppose the first part of the rent would come under the provisions of the act in reference to the liquidation of liens, etc., as provided for by the fourteenth and twentieth sections of the act.

## Case No. 12,044.

The ROSE.

[1 Gall. 211.][1]

Circuit Court. D. Massachusetts. Oct. Term. 1812.

NON-INTERCOURSE—FORFEITURE—NEUTRAL GOODS.

Goods of British manufacture, imported from a neutral country into the United States. are forfeited under the act of 1st March, 1809 [2 Stat. 529] c. 91, notwithstanding they have become incorporated into the general stock of such neutral country. See U. S. v. Mann [Case No. 15,718]. Condemnation on the facts.

The information alleged, that sixty casks of rum, being of the growth, produce and manufacture of a colony or dependency of Great Britain were, at Matanzas, with the knowledge of the owner and master of the brig, laden and put on board thereof, with intention to import the same into the United States, and were afterwards actually imported into the United States, to wit, at Boston, contrary to the act 1st March, 1809 [2 Stat. 529] c. 91, and the act 2d March, 1811 [2 Stat. 651] c. 96. It was admitted that the brig came from Matanzas, in the island of Cuba, with the said casks of rum on board, and arrived at Boston about the 1st of August, A. D. 1811. At the trial, the main controversy turned upon the questions, whether the rum was of British origin; and, if so, whether the master or owner had knowledge thereof. The evidence introduced by the government came from very skilful and experienced witnesses, who declared, that they had tasted and examined, indiscriminately, a considerable portion of the casks composing the cargo, and, excepting three or four casks of an inferior quality, they were satisfied that it was rum of the British West India islands. They further stated, that the flavor of English island rum differed essentially from that of the other colonies, and was as easily distinguishable from Spanish rum, as Madeira from claret wine; that they were well acquainted

[1] [Reprinted from 3 N. B. R. 265 (Quarto, 63) by permission.]

[1] [Reported by John Gallison, Esq.]

with Spanish rum, which was of a very inferior character; but as that rum was not suited for the American market, and little or none had been imported for ten or twelve years last past, they could not speak positively, whether its quality had latterly been improved, or not; but they entertained no doubt that this cargo was of British origin. The evidence, on the part of the claimants [William F. Salter and others], consisted chiefly of testimony, to prove that of late years there had been great improvements made in Spanish rum, but that it was rarely or never voluntarily sent to the United States, and was usually sent to South America, or the coast of Africa; that some of the rum lately made in Cuba was equal to Jamaica rum; but in general its quality was very inferior; that perhaps it would not be easy to procure there a cargo of sixty or seventy hogsheads of rum equal to that of Jamaica; that since the non-intercourse act of 1809, vessels frequently came with rum from the British islands to Cuba, but they usually brought but small quantities, as ten or twenty hogsheads. The claimants, although the object of the government in examining the rum was not concealed from them, offered no testimony of any witnesses who had tasted any of the cargo, except the three or four hogsheads above alluded to. and these witnesses concurred in their opinions with those of the government; and indeed had been requested to taste the rum by the collector of the port. There was some evidence introduced as to other collateral facts, which it is not necessary to notice, because it did not affect the decision.

William Prescott, for claimant.
G. Blake, for the United States.

STORY, Circuit Justice. Taking the whole evidence together, I cannot resist the impression, that this was rum, the produce of a British West India island. It has been said that nothing is more uncertain than the taste, and that it would be harsh to found a decree upon its decisions; but I do not yield to the suggestion. The taste may, nay on many occasions must be, as good and safe a criterion as the eye. Sweet and sour, bitter and mild, are almost universally distinguishable, and flavor may be no less certain. Here is a witness of great respectability, who testifies that he has been employed nineteen years in the customs to examine spirits and liquors, and he declares that he can readily distinguish the various kinds, and, to use his own words, as readily as claret from Madeira wine, or as bohea from green tea. Besides, our revenue laws are predicated upon this supposed distinction of the different kinds of wine; nay, even of the different qualities of the same wine, for they pay different duties; yet it is chiefly by the taste that they can be classed and discriminated. Act 10th Aug., 1790 [1 Stat. 180] c. 39, § 1. In the present case, I am asked to set aside solemn testimony by conjecture; to declare doubts, where the evidence, if believed, presents none. Now if this rum had been so questionable in taste, why was it not examined and tasted by persons of skill on the part of the claimants? There is not a shadow of evidence to show that any person would have doubted as to the quality of this rum; and when the claimants have not offered any such testimony to relieve the case, I think myself bound to believe that none could be produced. But it is said, that there is no evidence that the master or owner had any knowledge that this rum was of British origin. But, if I believe the testimony of the claimants, such rum was frequently introduced into Cuba. Perhaps prima facie, an article imported from a country where that article is known to be manufactured, is to be presumed to have been of domestic manufacture; but considering the present state of the commercial world, I think even this presumption is but slight; and it is certainly removed by evidence of the free introduction of the same article of a foreign manufacture. At the time when the present cargo was purchased, I must presume, in the absence of all other evidence, that it was examined by the master. As it is proved to be of English origin, I must presume that he could distinguish its quality, since it has been proved to be easily distinguishable. This presumption is not conclusive, but it throws the burthen of the contrary on the claimants. They can rebut it by showing the time, manner, price, and circumstances of the purchase. They could introduce evidence to show its domestic origin, or at least trace its history so far as to create a reasonable doubt, which would repel the imputation of knowledge. They have not so done; and I am bound to believe, therefore, that it cannot be done. The statutes of this country must be considered as known to the citizens; and although the law will not presume a criminal violation of duty, yet, in these cases, it requires diligence and good faith on the part of the merchant. If he will wilfully shut his eyes against the light; if he will not inquire, though circumstances present calling for inquiry; it is at his peril. When the goods are shown to be of foreign growth or manufacture, he cannot disclaim knowledge, unless he shows facts and circumstances. from which his ignorance may be fairly inferred. I think in this case the presumption of knowledge is violent. It has been further insisted, that the act was never meant to be applied to foreign articles, which had been incorporated with the common stock of the country; and that the rum in this case ought to be considered as so incorporated. But I see no such limitation in the statute. The words are, "nor shall it be lawful to import into the United States, or the territories thereof, from any foreign port or place, any goods. &c. being of the growth, produce or manufacture, &c. of Great Britain or Ireland, or of any of the colonies or

dependencies of Great Britain;" and I do not feel at liberty to narrow the construction of language so clear and decided. If indeed the argument were admitted, the act might as well be erased from the statute book; for as to effective purposes, it would be nugatory and idle. I must therefore reverse the decree of the district court, and condemn the property with costs to the United States. Condemned.

ROSE (BIAS v.). See Case No. 1,382.

ROSE (FOLLETT v.). See Case No. 4,900.

## Case No. 12,045.

### ROSE v. HIMELY et al.

[Bee, 313.] [1]

Circuit Court, D. South Carolina. Jan. 11, 1805.

PRACTICE IN ADMIRALTY — APPEAL — NEW EVIDENCE.

New evidence admissible on appeal, and time given to produce it, on proof that appellant was chargeable with no laches in not producing it in the court below.

[Cited in The Venezuela, 3 C. C. A. 319, 52 Fed. 874.]

[Appeal from the district court of the United States for the district of South Carolina.]

In admiralty.

BEE, District Judge. Certain parcels of coffee were libelled against as having been illegally captured on the high seas, and sold without any condemnation. They were claimed by Himely and others, who stated that the Sarah had been engaged in an illicit trade with the brigands; that, on her return, she was captured by a French privateer and carried into Barracoa, where she was duly libelled and condemned: and, though she had not been duly condemned, yet that the cargo could not be reclaimed, as it was sold by consent of the supercargo of the libellants. On the sixth day of September last this cause came on to be heard before the district court, and the articles libelled were condemned for want of evidence to support the allegations of the claimant. [Cases Nos. 12,047 and 12,048.] From this decision an appeal is made to the circuit court, and two questions have been argued, upon which I am now to decide. 1st. Whether the party appellant is entitled to adduce new evidence. 2d. Whether, upon cause shewn, the court would assign him a term probatory, for that purpose.

Upon the first question, the argument of counsel turned chiefly upon the construction of the act of congress of March 3, 1803 [2 Stat. 244], which gives the right of appeal from the district to the circuit court, and from the latter to the supreme court of the United States. It was admitted that the clause respecting the adduction of new evidence re-

[1] [Reported by Hon. Thomas Bee, District Judge.]

lates solely to the supreme court; but, if the supreme court was bound to receive new evidence in such cases, it was contended that there would be an absurdity in denying the right to do so to the circuit court, to which an appeal lies in the first instance.

It does not appear to me that the question in this case depends at all upon the construction of this act. The clause which relates to the adduction of new evidence in the supreme court, was intended only to restrict that court from receiving new evidence in any other causes than those of admiralty or maritime jurisdiction; with regard to which that court is left at liberty to regulate its proceedings by the principles of the civil law, by which they are governed in such cases. Whether, therefore, the appellant in an admiralty cause is entitled to produce new evidence, is a general question; and, however inconsistent it may appear to those who consider the subject according to the principles of common law, it is certainly laid down in writers upon the civil law (Clarke, Praxis; Conset, Courts; Browne, Civ. Law) that the appellant has the privilege "non allegata allegare, et non probata probare;" or, in other words, to go into a plenary investigation of his case under a very few restrictions, introduced only for the purpose of protecting the appellee, as it should seem, from the danger of perjury or surprise. An appeal, therefore, in the admiralty is rather in nature of a new trial, in which the court does not enter into the mere consideration of the propriety of the decision of the judge below, upon the evidence before him, but affords an opportunity to the appellant to present his case with the best possible aspect that new allegations, or new evidence can afford it.

My decision on the second point must depend upon the nature of the evidence proposed to be adduced, and the sufficiency of the grounds set forth in the affidavit to shew that the inability of the claimant to produce such evidence at the time was not attributable to his own laches. The evidence proposed to be adduced was a duly certified copy of the condemnation, and the examination of witnesses to prove that the libellant had consented to the sale at which the claimant purchased: and the cause shewn on affidavit why he is not chargeable with laches is the embarrassed state of French affairs in the island of St. Domingo, and the loss of a vessel by which he had ordered the sentence of condemnation to be forwarded, and the captain of which was a witness to prove the assent of the libellant to the sale. With regard to the materiality of the evidence, there can be no doubt: a condemnation sanctioned by the law of nations would have set every question to rest; and the assent of the supercargo to the sale at which the claimant purchased would certainly have changed the property of the articles sold, so that the libel could not have been sustained, however the libellant might have retained a claim against the cap-